George BERNSTEIN, acting for and on Behalf of the COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF VERMONT as Receivor for the purpose of rehabilitation of Ambassador Insurance Company and James P. Corcoran, Superintendent of Insurance of the State of New York as Rehabilitor of Horizon Insurance Company, Plaintiffs,

v.

CENTAUR INSURANCE COMPANY, Defendant.

No. 83 Civ. 7989 (JMC).

United States District Court, S.D. New York.

Sept. 8, 1986.

Leigh R. Isaacs, Kroll, Tract, Pomerantz & Cameron, New York City, for plaintiff George Bernstein.

Laurence Greenwald, Stroock & Stroock & Lavan, New York City, for plaintiff James P. Corcoran.

John M. Nonna, Werner, Kennedy & French, New York City, for defendant.

## OPINION

CANNELLA, District Judge.

Following a nonjury trial on the merits, the Court finds for the defendant in part and plaintiff George Bernstein in part. Fed.R.Civ.P. 52(a).

## BACKGROUND

This diversity action was brought by Ambassador Insurance Company ["Ambassador"] and Horizon Insurance Company ["Horizon"]. On November 10, 1983, the Superior Court of the State of Vermont declared Ambassador insolvent and appointed the Commissioner of Banking and Insurance—as rehabilitator. On December 7, 1983, the Supreme Court of the State of New York declared Horizon insolvent and appointed the Superintendent of Insurance of New York as rehabilitator. On January 31, 1984, George Bernstein and James P. Corcoran, acting on behalf of the rehabilitators of Ambassador and Horizon respectively, were substituted as plaintiffs. *See* Memorandum and Order at 1–2 & nn. 1–3, 83 Civ. 7989 (JMC) (S.D.N.Y. Nov. 11, 1984) ["November Memorandum and Order"].

In this action plaintiffs allege breach of reinsurance contracts. The Court previously granted defendant Centaur Insurance Company's ["Centaur"] motion to dismiss a portion of the complaint and granted in part Centaur's motion to stay the action pending arbitration. *See* November Memorandum and Order; Order, 83 Civ. 7989 (JMC) (S.D.N.Y. Jan. 24, 1985) ["January

Order"]. The Court ruled that two issues were to be decided by the Court: (1) whether reinsurance certificates numbered CF–719 and CF–720, the "Flexi-Van" and "X-Tra" risks respectively, are voidable, as claimed by defendant, and (2) whether reinsurance coverage on Ambassador's policy # GOA 792034 and Horizon's policy # 100894, which insured Budget Rent-a-Car for 1981–1982, was extended to cover the 1982–83 term. *See* January Order at 1–2. Following a more complete presentation of the issues in the pretrial briefs, it became apparent that the first of these issues could properly have been submitted to the arbitrators. However, in light of defendant Centaur's consent to submit the issue to the Court, *see* Supplemental Affidavit of Gerald F. Murray at ¶ 3, 83 Civ. 7989 (JMC) (filed Dec. 17, 1984), both issues were presented at trial.

The evidence adduced at trial disclosed an appalling laxity on the part of all insurance companies involved—a laxity which was cleverly manipulated by one Leonard Rogers, who unfortunately failed to live to tell the tale. In addressing each of the issues before it, the Court is faced with determining which company must bear the burden of Roger's apparently fraudulent or at least extremely careless behavior. Having reviewed the evidence and considered the demeanor of the witnesses the Court makes the following findings of fact.

## FINDINGS OF FACT

1. In 1981, 1982 and 1983, Ambassador was an insurance company organized under the laws of the State of Vermont and engaged in the business of writing property

and casualty insurance. During the same years, Horizon was a wholly owned subsidiary of Ambassador and similarly engaged in the business of writing property and casualty insurance. At all relevant times, Arnold Chait was President of Ambassador and Horizon.[1]

2. In 1981, 1982, and 1983, Centaur, an Illinois corporation, was an insurance company licensed to do business in the State of New York. During most of the relevant period, Centaur's wholly owned subsidiary, Atlantic and Gulf Insurance Agency, Ltd. ["Atlantic & Gulf"], served as Centaur's general agent for direct insurance and facultative[2] reinsurance.[3]

3. In 1979, Leonard Rogers was hired by Atlantic & Gulf as chief facultative underwriter.[4] Rogers was later promoted to Vice-President of Production and held that title on September 1, 1981.[5] While he was employed by Atlantic & Gulf, Rogers had the authority to underwrite and accept facultative reinsurance on behalf of Atlantic & Gulf and Centaur.[6]

4. In November 1981, Rogers formed Guaranteed Insurance Underwriters ["Guaranteed"], of which he was President and principal shareholder.[7]

5. The Managing Director of Atlantic & Gulf during the period March 1978 through April 1982 was George B. McNeill.[8] Richard Pluth was a Vice-President of Operations at Centaur from April 1981 through April 1983.[9]

6. On January 19, 1982, Rogers submitted his resignation to George B. McNeill and, at the request of Richard Pluth, left the company's employ on that day.[10]

---

1. Trial Transcript ["Tr."] at 128–29.

2. Reinsurance is a transaction whereby the "assuming reinsurer" agrees to indemnify the "ceding insurer" (i.e. the reinsured) against all or part of a loss sustained under policies issued by the ceding insurer. "Facultative" reinsurance is the reinsurance of an individual risk. *See* Tr. at 613–15.

3. Tr. at 375.

4. Deposition of George B. McNeill at 50–51; Tr. at 36–37.

5. Plaintiff Corcoran's Exhibit ["PCx"]–6.

6. *See id.*

7. Tr. at 155.

8. Tr. at 574–77.

9. Tr. at 374, 423.

10. Tr. at 379–80; Defendant's Exhibit ["Dx"]–BB.

A. *Budget Rent-a-Car ["Budget"] Risks*

7. In 1981 Kahn-Carlin Insurance Agency was a retail insurance broker representing Budget in New Orleans and Miami.[11] In June 1981, Don Carlin, the president of Kahn-Carlin, discussed with Rogers the placement of the Budget insurance account. Rogers told Carlin at that time that he was an employee of Atlantic & Gulf.[12] Carlin said that he wanted the Budget policy written by an "A" rated company,[13] and Rogers indicated that he would submit a proposal.

8. Thereafter, Rogers proposed that Ambassador and Horizon each carry part of the Budget insurance, reinsured 100% by Centaur. Carlin understood that Rogers had arranged to have Ambassador and Horizon front[14] the Budget risk because both were A + rated companies, while Centaur had only a B + rating.[15]

9. Before agreeing to participate in this arrangement, Chait had Horizon's counsel, Michael Skay, write to Centaur, to confirm that Atlantic & Gulf was an agent of Centaur "for the purpose of arranging facultative reinsurance."[16] Owen B. Davies, President of Centaur, confirmed by letter as follows:

> Thank you for your letter of August 27, 1981, relating to your arranging facultative reinsurance with our Company through Mr. Leonard Rogers.
>
> Mr. Leonard Rogers is Vice President-Production of Atlantic and Gulf ... This Agency is a wholly-owned subsidiary of Centaur....[17]

10. On September 28, 1981, Rogers, apparently on behalf of Atlantic & Gulf, telexed Daniel Lynch, Vice-President of Underwriting for Ambassador and Horizon to confirm the coverage.[18] Thereafter, on January 28, 1982, Ambassador issued its policy number GLA 792034 to Budget for the period October 1, 1981 to October 1, 1982, and Horizon issued its policy number GLH 1008944 to Budget covering the same period. The Ambassador policy covered New Orleans operations; the Horizon policy covered Miami, Florida.[19]

11. Reinsurance certificates were not issued for these policies until the fall of 1982. Nor was Ambassador or Horizon billed for premiums until after the expiration of the policies.[20]

12. In July 1982, Horizon notified Atlantic & Gulf that the 1981–1982 Budget policy would expire on October 1.[21] No other written communication passed between the reinsurer and reinsured concerning the renewals of the policies. Following March 1982, Atlantic & Gulf had no authority to write facultative reinsurance and there are no records to indicate that it issued any such policies effective later than March 1, 1982.[22]

13. Following Rogers' departure from Atlantic & Gulf on January 19, 1982, no one at Centaur or Atlantic & Gulf informed Horizon or Ambassador that Rogers had left their employ.[23] However, there is no custom or practice in the industry for an assuming reinsurer to notify a ceding insurer when an officer or underwriter of the assuming reinsurer leaves its employment.[24] Nor was there a custom or prac-

---

11. Deposition of Don Carlin at 18, 25–26; Tr. at 11, 13.

12. Carlin Deposition at 16, 18.

13. *Id.* at 22.

14. A "fronting" arrangement exists when a ceding company is 100% reinsured on a risk. *See* Tr. at 613–14.

15. Carlin Deposition at 22–24.

16. *See* PCx–5; Tr. at 132–33.

17. PCx–6.

18. PCx–7.

19. PCx–1, 3.

20. *See* PCx–2, 4; Tr. at 509–17.

21. *See* PCx–34.

22. Tr. at 334, 482.

23. *See* Request for Admissions 67, PCx–43.

24. Tr. at 616–17, 637–38.

tice at Ambassador and Horizon to notify other insurance companies when an officer or underwriter left their employment.[25]

14. Daniel Lynch knew that Rogers had left Atlantic & Gulf in January 1982. Chait, Lynch and others at Ambassador and Horizon knew that Rogers had formed Guaranteed in the fall of 1981, and Chait may have known that Rogers had left Atlantic & Gulf.[26]

15. Ambassador and Horizon never requested confirmation that Guaranteed was an agent of Centaur for the purpose of binding facultative reinsurance and were never notified that Guaranteed had such authority.[27]

16. Prior to October 1, 1982, Rogers called Chait and asked him if Ambassador and Horizon wanted to front the coverage once again on the same terms as under the prior policies. Chait agreed to have Ambassador and Horizon front the coverage as before.[28] On October 20, 1982, Rogers wrote two letters on Guaranteed's letterhead confirming the renewal coverage with 100% reinsurance by Centaur. In both letters, Rogers signed as President of Guaranteed. He did not represent himself to be an employee of Atlantic & Gulf.[29] Rogers was not employed by Atlantic & Gulf or Centaur, nor was he authorized to bind facultative reinsurance for them in October 1982.[30] Neither Atlantic & Gulf nor Centaur confirmed renewal coverage.[31]

17. In reliance on Rogers' statements that the risk was to be reinsured by Centaur, Horizon and Ambassador renewed the underlying coverage to Budget.[32]

18. On two occasions Ambassador and Horizon requested Rogers to forward the reinsurance certificates for 1982–1983. Both requests were sent to Rogers at Guaranteed.[33] The certificates were never received.

19. Martin Hoffman was an independent consultant employed by MIH Consultants, a firm retained by Centaur to institute a computerized accounting system. His duties included accounting for Atlantic & Gulf's facultative reinsurance premiums, including the Budget accounts. He also undertook to issue certificates for the 1981–1982 coverage.[34] He did not have authority to bind Centaur to any reinsurance coverage.[35] Chait was aware of this status, both because Hoffman told him he was an independent accountant and because he communicated with Ambassador and Horizon on his own MIH letterhead.[36]

20. On December 29, 1982, Hoffman and Ms. Sandra Eckenbrecht, Operations Manager for Centaur, visited Chait at his New Jersey office to discuss reinsurance premiums for the 1981–1982 coverage. Chait gave Hoffman two checks for a portion of the premium.[37] Although Chait claims that Hoffman told him that the renewal certificates were being prepared,[38] the Court, having considered the demeanor of the witnesses and the context of the conversation finds credible Hoffman's assertion that no such statement was made.[39] Hoffman may have said he would look into it. In late 1982, Hoffman spoke with Harry Rinder, the manager of Atlantic & Gulf, and told him either that Chait and Rogers had asked whether the reinsurance for the Budget risks had been renewed or that

25. Tr. at 489.

26. Tr. at 192, 487–89.

27. Tr. at 203.

28. Tr. at 137, 182.

29. PCx–26, 27.

30. Tr. at 63, 379.

31. Tr. at 183.

32. PCx–28, 29.

33. PCx–30, 32.

34. Tr. at 360, 541–42.

35. Tr. at 105, 213, 320, 392, 508, 569.

36. PCx–14, 15, 16; Dx–X; Tr. at 522.

37. Tr. at 142, 210, 238, 519–20, 540.

38. Tr. at 143–44.

39. Tr. at 119, 520, 551–54.

Chait and Rogers actually believed such to be the case.[40] The Court finds that it is unclear exactly what Hoffman said to Rinder in light of the fact that counsel on both sides elicited Hoffman's testimony by means of leading and inconsistent questions. Additionally, Rinder did not have authority to bind risks on facultative reinsurance.[41]

21. In January 1983 there was a meeting between representatives of Ambassador and Horizon, including Chait, and representatives of Centaur. Chait did not inquire about the Budget reinsurance.[42]

22. On March 18, 1983, Hoffman wrote a letter ["Hoffman letter"] to Sandra Eckenbrecht. In this letter he stated, inter alia:

> We must also prepare the reinsurance certificates for the renewal of the Budget.... Account for the Florida and Louisiana locations. The renewal dates for these locations are 10/1/82 through 10/1/83. We have also been advised that the Budget Rent-a-Car for Los Angeles California has attached under an individual certificate for the period 1/1/83 through 10/1/83.[43]

This statement was based on what he had been told by Rogers and Chait. He had no independent knowledge of whether the renewal was in effect nor any authority to bind Centaur on the renewal.[44]

23. Following her receipt of the Hoffman letter, Eckenbrecht told Hoffman that there was no documentation in the file to indicate Centaur had agreed to reinsure the 1982–1983 Budget risks.[45] No one at Centaur made any effort to notify anyone at Ambassador or Horizon that the renewal

was not in place, despite the fact that Chait was copied on the letter.[46]

24. On April 14, 1983, Horizon and Ambassador submitted three claims arising after October 1, 1982 ["April Claims Report"]. The letter references the certificates for the 1981–1982 policy period.[47] Thereafter, an investigation was begun at Centaur to determine whether renewal coverage might be in effect, despite the absence of any documentation in the file. Thomas Hughes, an internal auditor for Borg-Warner, sent a telex to Chait requesting his file on Budget. Hughes wanted to make sure that defendant had no records indicating that a reinsurance renewal was in effect.[48]

25. The claims referenced in the April Claims Report arose in late 1982 and early 1983.[49]

26. On June 21, 1983, representatives of Centaur met with representatives of Ambassador and Horizon. Nothing was said to Centaur representatives concerning renewal of the Budget risks.[50]

27. On July 6, 1983, Joseph P. Wolonsky, Vice-President of Finance at Centaur, wrote Chait advising him that Ambassador and Horizon had erroneously included in their loss reports losses occuring after the expiration of the reinsurance.[51]

28. There is a custom and practice in the insurance industry that a ceding insurance company will initiate a request for renewal of coverage, even in a fronting situation. Neither side is obligated to automatically renew coverage.[52]

## B. *Flexi-Van and X-Tra Risks*

29. Sometime prior to November 9, 1981, Schiff Terhune, agent for the in-

---

**40.** Tr. at 543, 551.

**41.** Tr. at 551–52.

**42.** Tr. at 191.

**43.** PCx–20, 21.

**44.** Tr. at 525–27.

**45.** Tr. at 107, 117.

**46.** PCx–20, 21; Tr. at 71, 123, 146, 148, 414, 416.

**47.** PCx–53.

**48.** PCx–23; Tr. at 77–80.

**49.** Tr. at 80.

**50.** PCx–25; Tr. at 188, 223–24.

**51.** PCx–25; Tr. at 147–48; 350–51.

**52.** Tr. at 615–16.

sureds, contacted LMG Excess, Inc. ["LMG"] in respect of container insurance for Flexi-Van and X-Tra. LMG, in turn, sought to insure the risks through Agency Facilities, Inc. ["Agency Facilities"], a company which had produced considerable business for Atlantic & Gulf and Centaur. Agency Facilities contacted Atlantic & Gulf, seeking 10% participation in the Flexi-Van and X-Tra risks.[53]

30. Atlantic & Gulf made the underwriting decision to insure these risks on behalf of Centaur.[54]

31. Leonard Rogers determined that Flexi-Van and X-Tra would not accept insurance from a company rated only "B + " by *Best's Insurance Reports.* Consequently on November 9, 1981, Rogers, on behalf of Centaur and Atlantic & Gulf, telexed[55] Ambassador, an "A + " rated company and asked it to front[56] for Centaur on its 10% participation. Ambassador agreed to front the risk in exchange for a 12½% commission. Centaur would thus reinsure Ambassador for 100% of the risk in exchange for the premiums paid by Flexi-Van and X-Tra minus the 12½% commission.[57]

32. Because Ambassador was merely fronting for Centaur, it did not underwrite the risk, receive the gross premium, pay the producing broker a commission or actively obtain reinsurance as it would have, had it initiated the transaction.[58]

33. That Ambassador did not initiate the insurance transaction is evidenced by the fact that the Flexi-Van and X-Tra risks involved insurance of marine containers which were not a class of business Ambassador regularly insured.[59]

34. At some point after January 1, 1982, Daniel Lynch, then Chief Facultative Underwriter at Ambassador, executed two participation agreements prepared by Schiff Terhune which bound Ambassador to insure 10% of the total Flexi-Van and X-Tra risks.[60]

35. On December 29, 1981, George Zelenko of Agency Facilities, sent Rogers a telex confirming that 10% of the Flexi-Van and X-Tra risks would be bound "as part of Ambassador."[61] Thereafter, on January 11, 1982[62] and January 20, 1982[63] Zelenko communicated further with Rogers requesting that Ambassador be bound and policies issued on the risks.

36. On or after April 19, 1982, after Rogers had left the employ of Atlantic & Gulf, his name was affixed to the Ambassador policies purporting to bind these risks.[64]

37. In light of Zelenko's January requests to Rogers, the Participation Agreements signed by Lynch appear not to have been executed prior to January 20. Nonetheless, the Court finds credible Lynch's testimony that he, and not Rogers, had the authority to and did in fact bind Ambassador to these risks by signing the participation agreements.[65] The Court also finds that the policies were administrative in nature.

38. Neither Guaranteed nor Rogers received any commission from Ambassador in connection with the Flexi-Van and X-Tra insurances. Although Guaranteed had en-

**53.** Plaintiff Bernstein's Exhibit ["PBx"]–30; Tr. at 445–53, 665.

**54.** Tr. at 448.

**55.** PBx–30.

**56.** *See* fn. 14 *supra.*

**57.** Tr. at 264–66, 282–89, 401–02, 452, 456, 545, 657–62.

**58.** Tr. at 290–91, 660–61.

**59.** Tr. at 289; *see also* Tr. at 663.

**60.** PBx–31, 32; Tr. at 643–44, 663–67.

**61.** Dx–AU.

**62.** Dx–AV.

**63.** Dx–AW.

**64.** Dx–BC, BD.

**65.** Tr. at 665; *see also* Tr. at 298, 317, 668. The Correspondent's Agreement between Ambassador and Guaranteed did not give Guaranteed or Rogers authority to bind Ambassador on insurance risks. *See* Dx–L.

tered into a "Correspondent's Agreement" with Ambassador on December 22, 1981, the Court finds that agreement did not create an agency and was unrelated to the Flexi-Van and X-Tra risks.[66]

39. During 1982 Guaranteed received money from Agency Facilities with respect to the Flexi-Van and X-Tra risks. On December 7, 1982, Guaranteed remitted these receipts to Ambassador in partial payment of Ambassador's 12½% commission.[67]

## CONCLUSIONS OF LAW

A. *The Budget Risks*

a. *Actual Authority*

■ 1. Leonard Rogers had no actual authority to bind Centaur or Atlantic & Gulf to the renewal of the Budget reinsurance for the period October 1982 to October 1983.

■ 2. Centaur had no duty to automatically renew the Budget reinsurance for the period 1982–1983. *See* 13A J. Appleman & J. Appleman, *Insurance Law & Practice*, § 7642, at 410–13; *Casualty Co. v. United States Casualty Co.*, 161 App. Div. 591, 592–93, 146 N.Y.S. 957 (1st Dep't 1914), *aff'd*, 221 N.Y. 560, 116 N.E. 1039 (1915).

b. *Apparent Authority*

■ 3. An agent or purported agent has apparent authority to bind his principal to a contract with a third party when the third party reasonably relies on manifestations of the agent's authority induced by the principal. *See Frank Mastoloni & Sons Inc. v. United States Postal Serv.*, 546 F.Supp. 415, 417–18 (S.D.N.Y.1982); *Restatement (Second) of Agency* ["Restatement"] § 125, at 319.

■ 4. Apparent authority terminates when the third person has notice of the termination of the agent's actual authority. *See* Restatement § 125, at 318.

■ 5. Parties are deemed to have sufficient notice of the termination of an agent's authority if they have enough facts in their possession to put them on inquiry. *See Claflin v. Lenheim*, 66 N.Y. 301, 306 (1876); *see also Frank Mastoloni & Sons Inc. v. United States Postal Serv.*, 546 F.Supp. 417–18; Restatement § 135, at 333. Additionally, it is "a well-settled principle of agency that, as a general rule, the principal is bound by notice to or knowledge of his agent in all matters within the scope of the agency." *Hurley v. John Hancock Mutual Life Ins. Co.*, 247 App.Div. 547, 288 N.Y.S. 199, 202 (4th Dep't 1936), *quoted in Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 26 (2d Cir.1974).

■ 6. Horizon and Ambassador did not reasonably rely on manifestations of Roger's authority induced by Centaur because they had actual notice that Rogers had left Atlantic & Gulf and they had reason to inquire into the authority with which Rogers purported to act in the summer and fall of 1982. Lynch actually knew, at the time that he received Roger's letter of October 20, 1982,[68] that Rogers no longer worked for Atlantic & Gulf. This knowledge was squarely within the scope of Lynch's agency and thus imputed to his principal. Additionally, Rogers communicated with Ambassador and Horizon concerning renewal coverage only in his capacity as president of Guaranteed, which had no authority, actual or apparent, to bind Atlantic & Gulf or Centaur on this matter. Accordingly, Rogers had no apparent authority with respect to the Budget risks.

c. *Equitable Estoppel*

■ 6a. In order to prove their claim of equitable estoppel, plaintiffs must show that they actually and reasonably relied to their detriment on the other party's misrepresentation or concealment of a material fact. *See* 3 J. Pomeroy, *Equity Jurisprudence* § 805, at 190–91.

**66.** Tr. at 291, 550.

**67.** Dx–BF.

**68.** PCx–27.

■ 7. For the same reasons outlined above, the Court finds that there was no actual or reasonable reliance on Centaur's failure to disclose Roger's termination.

8. The only statement of Hoffman's that plaintiffs might possibly have relied on was the March 18, 1983 letter.[69] Plaintiffs, however, have failed to show that they suffered any detriment as a result of such reliance. On the contrary, the only claims on the Flexi-Van and X-Tra policies of which there is any evidence apparently arose long prior to this date. Moreover, in light of plaintiff's knowledge of Hoffman's limited authority and Roger's lack of authority to bind Centaur or Atlantic & Gulf on these reinsurance policies, the Court finds that any such reliance would be unreasonable.

### d. *Ratification*

■ 9. Ratification of apparent authority requires that the principal have full knowledge of all material facts and either take some action to affirm the purported agent's actions or fail to repudiate the purported agreement. *See* Restatement §§ 93, 94; *see also Mastoloni v. United States Postal Serv.,* 546 F.Supp. at 421; *Imero Fiorentino Assocs. v. Green,* 85 A.D.2d 419, 447 N.Y.S.2d 942, 944 (1st Dep't 1982).

10. Plaintiffs rely on the following statements in making their ratification claim:

■ (a) Hoffman's alleged statements to Chait in December 1982.[70] The Court has found that such statements were not made and thus need not consider this basis for the claim further. In any event, Hoffman did not have apparent or actual authority to bind Centaur.

■ (b) Atlantic & Gulf and Centaur's silence after Hoffman made certain statements to Rinder in late 1982.[71] The Court finds that plaintiffs have failed to show

that Hoffman's statements to Rinder apprised Centaur of all material facts.

■ (c) Hoffman's March 18, 1983 letter.[72] The Court finds this letter could not in itself have been an affirmation of the renewal because Hoffman had no authority to take such action, a fact of which plaintiffs were aware. Moreover, to the extent that plaintiffs claim that Centaur had a duty to affirmatively repudiate the alleged contract following receipt of this letter, the Court finds that Centaur initiated an investigation once the April Claims Report was received and repudiated the contract within a reasonable time thereafter. In any event, this letter did not inform Centaur of Roger's statements which formed the basis of the alleged contract and thus did not provide Centaur with all material facts.

■ (d) Centaur's silence after receiving notice of the April Claims Report and the "deliberately vague" letter which Thomas Hughes sent in response.[73] As noted above, the April Claims Report led to a full investigation that resulted in a relatively prompt repudiation as soon as the full facts were known. Thus, Centaur's silence did not constitute a ratification.

For the foregoing reasons, the Court finds that Centaur was not bound as reinsurer on the Budget risks for 1982–1983. Accordingly, this claim is dismissed.

### B. *The Flexi-Van and X-Tra Risks*

■ 11. When an agent without the knowledge and consent of his principal represents an adverse party in a transaction, his contracts relating thereto are voidable at the option of the principal. *See John A. Westlund, Inc. v. O'Bryan Construction Co.,* 123 Vt. 301, 187 A.2d 507 (1963); *Restatement* § 313(2), at 52. An agent who does so act "must necessarily be unfaithful to one or the other as the duties which he owes to his respective principals are conflicting and incapable of faithful perform-

---

**69.** PCx–20.

**70.** *See* Findings of Fact, *supra,* at ¶ 20.

**71.** *See id.*

**72.** PCx–20.

**73.** *See* PCx–23.

ance by the same person." *Hasbrouck v. Rymkevitch*, 25 A.D.2d 187, 188–89, 268 N.Y.S.2d 604, 606 (3d Dep't 1966).

12. The doctrine of voidability on the ground of dual agency is limited to dual representation in the transaction sought to be voided. The dual agency concept does not extend to situations in which one acts as agent for more than one principal in different and unrelated transactions. Therefore, an agent may act as one party's agent in respect to one matter while representing another party in a separate matter. *See Koreska v. United Cargo Corp.*, 23 A.D.2d 37, 258 N.Y.S.2d 432, 436 (1st Dep't 1965).

13. The Correspondent's Agreement between Ambassador and Guaranteed does not give Guaranteed authority to bind Ambassador and thus does not create an agency.

14. Plaintiff Bernstein argues that the burden of proving dual agency is on defendant.[74] Neither party has cited any cases on the issue, and the Court has been unable to find any on point. However, in light of the fact that the issue of dual agency involves facts peculiarly in the control of the plaintiff and does not concern any overriding issue of public policy, the Court holds that once the defendant has raised sufficient facts to put dual agency at issue, the plaintiff bears the burden of proving the absence of dual agency. *Cf.* Corbin, *Contracts* §§ 749–51 (2d Ed.1960) (burdens of proof).

15. Plaintiff Bernstein has met his burden of proving absence of dual agency. The only evidence that Rogers acted as an agent for Ambassador with respect to the Flexi-Van and X-Tra risks are the policies to which Rogers' name was affixed. The date of these policies fell after Rogers had left his employment at Atlantic & Gulf. Moreover, the Court has found that these policies were administrative in nature not binding on Ambassador and Rogers, in any case, had no authority to bind Ambassador.

16. Rogers brought a "package deal" to Ambassador. Lynch accepted the deal on behalf of Ambassador. Any actions undertaken by Rogers on behalf of Ambassador, such as collecting and forwarding fees and processing, were merely ministerial and involved no discretion. *See Empire State Ins. Co. v. American Central Ins. Co.*, 138 N.Y. (93 Sickels) 446, 450, 34 N.E. 200 (1893). Rogers received no compensation from Ambassador with respect to these risks.

17. For these reasons, the Court finds that Rogers was not Ambassador's agent with respect to the Flexi-Van and X-Tra policies. Because the Court finds that there was no dual agency, it does not reach the questions of defendant's acquiescence in the dual agency or its failure to protest within a reasonable time.

Accordingly, the Court finds that the Flexi-Van and X-Tra reinsurance contracts are not voidable and directs that the action be stayed pending arbitration of damages on these contracts.

## CONCLUSION

For the foregoing reasons, the plaintiffs' claims with respect to the Budget Rent-a-Car risks for 1982–1983 are dismissed. Fed.R.Civ.P. 52(a). Plaintiff Bernstein's claims with respect to the Flexi-Van and X-Tra risks are stayed pending arbitration. Fed.R.Civ.P. 52(a); 9 U.S.C. § 3. The action is dismissed with leave to reopen following completion of the arbitration proceedings.

SO ORDERED.

---

**74.** *See* Bernstein's Proposed Conclusion of Law at ¶ 1, 83 Civ. 7989 (JMC) (filed Dec. 18, 1985).