Shelly A. **JOHNSON** and Wayne D. Johnson, Plaintiffs,

v.

**NATIONWIDE GENERAL INSURANCE COMPANY, Nationwide Financial Services, Inc., Nationwide Life Insurance Company, and Nationwide Credit Union, Defendants.**

No. 94–CV–410.

United States District Court, N.D. New York.

Aug. 1, 1997.

Rossi, Murnane, Balzano & Hughes, Utica, NY (Vincent J. Rossi, Jr., of counsel), for Plaintiffs.

Felt, Evans, Panzone, Bobrow & Hallak, Clinton, NY (E. Porter Felt, of counsel), for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, Shelly A. Johnson ("Mrs. Johnson" or "plaintiff") and her husband Wayne D. Johnson, brought this action in the New York State Supreme Court of Oneida County. The defendants, Nationwide General Insurance Company and its affiliates ("Nationwide"), removed it to this court on the basis of diversity pursuant to 28 U.S.C. § 1332.

Mrs. Johnson alleges that on or about December 30, 1991, Michael P. Donnelly ("Donnelly"), an apparent agent of the defendants, induced her to invest $70,000 in a Nationwide tax free mutual fund, and then misappropriated the money. Mrs. Johnson originally made three claims against the defendants, but in a motion for summary judgment, two of the claims were dismissed. Issues of fact remained for trial in the remaining cause of action against Nationwide for the alleged fraudulent conversion or misappropriation by an apparent agent. *Johnson v. Nationwide Gen. Ins. Co.*, 937 F.Supp. 186 (N.D.N.Y. 1996). Familiarity with the prior decision is assumed.

## II. TRIAL

A two day bench trial was conducted on January 22 and 23, 1997, in Utica, New York. The plaintiff testified on her own behalf. Donnelly, Mary Donnelly,[1] and the plaintiff's mother, Margaret Kelly ("Mrs. Kelly"), also testified in support of the plaintiff. Donald K. Groves ("Groves"), an Asset Protection Manager in Nationwide's Corporate Security Department; Dennis Aultman ("Aultman"), a Nationwide Human Resources Consultant for the New England States; and John T. Lana ("Lana"), a Nationwide Sales Manager who supervised Donnelly, all testified on behalf of the defendants. The defense also called the plaintiff's husband, Wayne D. Johnson, as a hostile witness. Most of the voluminous exhibits introduced by both sides were Nationwide records. At the close of the proof, the derivative claim of Wayne Johnson was discontinued.

Post trial briefs and supplemental proposed findings of fact and conclusions of law were filed on March 24, 1997. Based upon all the evidence and the credibility of the witnesses, the court makes the following

---

1. Mary Donnelly is the wife of Michael Donnelly and the sister of the plaintiff.

Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## III. FINDINGS OF FACT

### A. Donnelly's Employment History

Donnelly was a Roman Catholic priest from 1971 to 1976. In 1976, he left the priesthood and began working for Nationwide in Frankfort, New York as an employee agent.[2] At this time, Nationwide registered Donnelly with the Securities Exchange Commission as a Nationwide agent authorized to sell securities. He later became a registered representative of the National Association of Securities Dealers ("NASD") because of his employment with Nationwide. Donnelly worked as an employee agent selling Nationwide insurance and securities for three years until he transferred to Columbus, Ohio to train for a position as a sales manager. After completing the required training, he moved to the Buffalo, New York area to work as a sales manager. As a sales manager, he supervised Nationwide's employee agents and represented independent contract agents. In Buffalo, Donnelly married his wife, Mary Donnelly. In 1981, Donnelly returned to Columbus to work as a trainer for Nationwide. As a trainer, he taught new agents Nationwide procedures and sales techniques. Three and a half years later, Donnelly moved to Connecticut to work as a Nationwide financial planner. At that time, he was still part of Nationwide management.

In 1988, Donnelly returned to sales and became an employee agent in Hartford, Connecticut. To start his business, Nationwide gave him the accounts of a recently retired agent and subsidized some of his expenses. At his Hartford office, Donnelly worked with another agent and sold all types of Nationwide products. Finally, in 1989, Donnelly became an independent contract agent.

Donnelly was a very successful Nationwide agent. In fact, he was one of its best. Nationwide recognized Donnelly's success by giving him awards and publicizing his accomplishments in the press. Donnelly won Nationwide's Champion Award in 1988, 1989, and 1990, and also won Nationwide's top sales award, the President's Award, in 1989 and 1990. When Donnelly won the President's Award, Nationwide published his photograph in the New England edition of Time Magazine. Donnelly worked as an independent agent until June 21, 1991, when he was terminated for treasury policy violations and his business practices.

### B. Donnelly's Fraud and Nationwide's Knowledge

Although Nationwide terminated Donnelly for treasury policy violations and business practices, the evidence demonstrates that Nationwide had knowledge of his fraudulent activity.

Donnelly began defrauding Nationwide customers at least as early as October 1990. The first known Nationwide customers that Donnelly defrauded were his mother-in-law, Mrs. Kelly, Ms. Grobsmith,[3] and Thomas Grobsmith.[4] Donnelly sold them Nationwide tax free mutual funds, and when the Gulf War began, he falsely informed them that their investments were no longer insured and were not collecting interest. He further recommended that they transfer the funds to his checking account so he could reinvest them in an annuity. Mrs. Kelly and the Grobsmiths agreed to the transfer. However, instead of transferring their investments into an annuity, Donnelly misappropriated the funds. This transfer violated NASD rules and the misappropriation was fraudulent.

An employee at the Nationwide home office spotted these transactions and alerted their investigative department to Donnelly's improper commingling of his clients' and his

---

2. Employee agents are different from independent contract agents. Employee agents are salaried employees who work for the parent company and receive only a small percentage of their income from commissions. Nationwide also covers many of the employee agent's operating expenses. Independent contract agents are not directly employed by Nationwide and receive all of their compensation from their sales commis-

sions. Both employee agents and independent contract agents are permitted to sell Nationwide securities and insurance.

3. Ms. Grobsmith is the plaintiff's aunt.

4. Thomas Grobsmith is the plaintiff's cousin.

personal funds. Nationwide investigated and discovered that several documents contained forged signatures. The investigators also determined that Donnelly had not reinvested the money. Several Nationwide managers held a meeting and concluded that "we needed to have Donnelly produce a written account of these transactions and have him sign a document that would allow us to examine his CuChex [5] account to see where the money went." (Pl.'s Ex. 13.) However, Nationwide failed to follow through with the investigation and never determined for certain whether Donnelly had embezzled the money.

Shortly after he defrauded his wife's relatives, Donnelly began over drafting checks and submitting his clients' payments late. He over drafted sixteen checks over a six month period. Nationwide recognized that Donnelly was acting improperly and repeatedly investigated and made attempts to remedy the situation. Nationwide asked Donnelly to explain his transactions, forced him to change his accounting procedures, and placed him on a cash only basis. Donnelly claimed that his bank had made mistakes or that the clients had over drafted the checks; however, Nationwide knew that he was lying. Finally, on June 21, 1990, Nationwide officially terminated Donnelly for these practices.

Although Nationwide did not have conclusive evidence that Donnelly was defrauding its clients when it made the initial decision to terminate him, Nationwide received this proof before the termination process was concluded. Nationwide received direct evidence of Donnelly's fraud on July 10, 1991. One of Donnelly's clients, Mr. Fiondella ("Fiondella"), contacted Nationwide and informed them that he had purchased an apartment insurance policy and that Donnelly never submitted it to the company. On July 31, 1991, Nationwide learned that another client, Mr. Desso ("Desso"), had purchased a $2,000 mutual fund from Donnelly, and that Donnelly kept the money for himself. In fact, Nationwide discovered that Donnelly had endorsed Desso's check to pay his American Express bill. Finally, a third client, Ms. Demonte ("Demonte"), purchased a car insurance policy and Donnelly kept the

money. Nationwide discovered this fraud on August 27, 1991. Donnelly was eventually forced to repay Fiondella, Desso, and Demonte with funds from his deferred compensation accounts. Nationwide had knowledge of the Fiondella and Desso transactions before Donnelly was evicted from his office, and an attempt was made to confiscate his supplies before Nationwide informed the Connecticut State Insurance Department ("Insurance Department") of his termination; and more than six months before his fraudulent dealings with the plaintiff.

There is further conclusive evidence that Nationwide had knowledge of Donnelly's fraudulent activity. When Nationwide notified the Insurance Department about Donnelly's termination through a Uniform Termination Notice for Securities Registration form dated August 8, 1991, it wrote that Donnelly was being terminated for *"diverting an investor's check for his own personal use."* (Pl.'s Ex. 57–1 Item No. 12.) On this form, Nationwide checked a box stating that Donnelly *"[c]urrently, is or at termination was, . . . . under internal review for fraud of wrongful taking of property or violating investment-related statutes, regulations, rules, or industry standards of conduct?"* *Id.* at Item 15. In the same document, Nationwide checked a box stating that Donnelly was *"the subject of an investment related, consumer-initiated complaint that: (1) alleged compensatory damages of $10,000 or more, fraud, or the wrongful taking of property?"* *Id.* at Item 13. (emphasis added). Thus, while the official reason Nationwide terminated Donnelly was his business improprieties, an additional reason was his fraudulent activities and the danger he posed to Nationwide's customers.

### C. *Nationwide's Response*

Nationwide terminated Donnelly as an actual agent by letter of Robert V. Meier, Regional Sales Manager, dated June 21, 1991, effective September 20, 1991. It terminated Donnelly's actual authority to bind business on behalf of the defendant by memo of John T. Lana, dated June 28, 1991. Upon

---

**5.** CuChex account is a Credit Union Checking    Account.

learning of this termination, Donnelly requested a hearing with a review board to reconsider his termination. The hearing was held on July 12, 1991, and the review board denied his appeal. Although the review board's decision was final, Donnelly remained a licensed agent for several months since Connecticut law prohibits an agent from being terminated without ninety (90) days notice. Therefore, Donnelly's license as a Nationwide agent was not revoked until September 20, 1991. After the review board's determination, Nationwide informed Donnelly by telephone and by written statement on July 21, 1991. On the phone and in the letter, Nationwide reminded Donnelly of the termination clauses in his contract that stated that he must vacate his office, return all Nationwide supplies, adhere to a noncompete clause, and could not contact any of his former clients. Donnelly did not voluntarily comply with these requests. Instead, he continued to sell Nationwide products and did not return all of Nationwide's supplies. Finally, Donnelly did not vacate his office until two supervisors appeared approximately one month later to remove him on or about August 15, 1991. Nationwide was unable to produce any records of this visit as to the date, inventory, or persons present.

When Nationwide terminated Donnelly, they took no action to inform his customers or the general public. There is no credible evidence in the record that Nationwide notified Donnelly's clients. Nationwide was unable to produce any documents or records to prove that they sent out such a notice. Nationwide did introduce a form letter which they claim should have been sent to Donnelly's customers, but this form letter was written in 1995 and obviously could not have been sent to Donnelly's customers in 1991. Lana, Donnelly's supervisor, testified that he received calls from Donnelly's clients who were concerned about the termination. However, Lana's testimony was not admitted to show that Nationwide had given notice, but rather to show that it had received calls. It is unknown when or how the former clients may have learned about Donnelly's termination. It may very well have been from the rumor mill. Furthermore, Donnelly had well over one thousand clients and

Nationwide failed to produce a single one who could testify that they had received written notice of Donnelly's termination. In fact, the only direct evidence regarding whether or not Nationwide informed its customers came from Mrs. Kelly, who owned a Nationwide Life Insurance Policy and was a client of her son in-law. Mrs. Kelly testified that she never received notice of Donnelly's termination. Finally, Nationwide admitted that they never gave any type of public notice about Donnelly's termination. Nationwide claims that it was not necessary to give notice because they did not know about Donnelly's fraudulent practice upon Nationwide clients.

After Donnelly was terminated, he was investigated by the Connecticut State Insurance Department. The Insurance Department temporarily suspended his license for ninety (90) days, but Donnelly was allowed to continue working in Connecticut after the suspension and he started with Pawson, another agency, and sold insurance for ITT Hartford. While selling for ITT, Donnelly defrauded its customers out of approximately $250,000. After working for ITT for several months, Donnelly transferred to another agency where he continued to defraud customers. In the fall of 1992, Donnelly confessed that he had defrauded his clients, and was criminally prosecuted. He pled guilty to grand larceny and spent several years in prison.

### D. The Present Action

The case at bar arises from a transaction that occurred after Donnelly was terminated by Nationwide. His sister-in-law, the plaintiff, received a large cash settlement from a personal injury lawsuit. Donnelly knew about this settlement, and during Thanksgiving 1991, he suggested to her that she invest it in a Nationwide tax free mutual fund similar to the one that her mother, Mrs. Kelly had owned. Donnelly then showed her a Nationwide prospectus for the fund. Mrs. Johnson asked Donnelly if he was still able to sell Nationwide products and Donnelly responded that he was no longer working exclusively for Nationwide and could not sell their insurance, but he was still authorized to

sell Nationwide tax free mutual funds. Mrs. Johnson accepted this explanation. She asked her mother if she was satisfied with her investment and Mrs. Kelly recommended that her daughter invest in the fund. On December 30, 1991, Mrs. Johnson invested $70,000 with Donnelly for a Nationwide tax free mutual fund. In response, Donnelly sent her an altered statement signifying that she had purchased the fund and sent her periodic statements. These statements were on Nationwide forms that Donnelly had .retained. Donnelly then misappropriated the money for his own personal use. However, before Mrs. Johnson learned of the fraud and before Donnelly absconded with all of the investment, Mrs. Johnson requested a $15,000 withdrawal and Donnelly sent it to her. Mrs. Johnson did not learn that she was defrauded until 1992 when Donnelly confessed to all of his crimes. Her total loss was $55,000.00 plus interest.

## IV. CONCLUSIONS OF LAW

■ Mrs. Johnson claims that Nationwide should be held accountable for Donnelly's actions because Donnelly acted under the guise of apparent authority when he fraudulently induced her to invest $70,000 in a Nationwide tax free mutual fund. The Supreme Court has held that " . . . a principle is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority." *American Soc'y of Mechanical Eng'rs Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982). The Court explained that apparent authority is designed to provide protection for third persons dealing with agents and that it is " 'for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal.' " *Id.* at 567, 102 S.Ct. at 1943 (quoting Restate-

ment (Second) of Agency § 262, cmt. a, p. 572 (1957)). Therefore, if Mrs. Johnson can demonstrate that Donnelly acted with apparent authority when she invested with him, then she may recover from Nationwide.[6]

Apparent authority must be created by the words, acts, or omissions of the principal. *Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir.1989); *Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir.1996). The Second Circuit has held that "a principal causes his agent to have apparent authority by conduct, which reasonably interpreted, causes third persons to believe that the principal consents to have an act done on his behalf." *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda–Permanent Mission*, 877 F.2d 189, 193 (2d Cir.1989). One court has held that there are three steps involved in establishing apparent authority:

> A third party [plaintiff] must show that (1) the words or acts of the principal communicated to the third party made it reasonable to believe that the agent possessed the authority to act for the principal; (2) the third party relied on this reasonable belief; and (3) the third party made reasonable inquiries as to the ostensible agents actual authority.

*Peoples Westchester Sav. Bank v. Ganc*, 705 F.Supp. 164, 169 (S.D.N.Y.1989); *Minskoff*, 98 F.3d at 708.

### A. Words or Acts of The Principal

■ "Essential to the creation of apparent authority are words or conduct of the principal communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984). These words and acts must be the acts of the principal and must not be the acts of the agent. *Fennell*, 865 F.2d at 502.

The word or acts of the principal may include, but are not limited to

6. Whether apparent authority exists is usually a question of fact for the jury; however, if the action is tried without a jury under Fed.R.Civ.P. 52(a), then apparent authority is treated as a mixed question of law and fact. *Herbert Constr.*

*Co. v. Continental Ins. Co.*, 931 F.2d 989, 994 (2d Cir.1991); *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 8 n. 15 (2d Cir.1978).

'direct statements to the third persons, directions to the agent to tell something to third persons, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area in which the agent acts and negotiates.'

*General Overseas Films Ltd. v. Robin Int'l Inc.,* 542 F.Supp. 684, 689 (S.D.N.Y.1982) (quoting *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.,* 414 F.2d 750, 756 (9th Cir.1969)), *aff'd.,* 718 F.2d 1085 (2d Cir. 1983). Following these guidelines, Mrs. Johnson must not rely on any of Donnelly's fraudulent activity to create apparent authority, but she may rely on the actions undertaken by Nationwide to promote Donnelly and bestow him with actual authority, and omissions by Nationwide when terminating that authority.

It is undisputed that Donnelly was an actual Nationwide agent until he was terminated in June of 1991, and that Nationwide heavily promoted him as their agent. Donnelly began working for Nationwide in 1976, and worked continuously for Nationwide in various capacities until he was terminated in 1991. Nationwide trained Donnelly and subsidized his office while he was an employee agent. Later, when he was an independent agent, Nationwide provided him with computer equipment, office supplies, clients, and advertising. Nationwide advertised Donnelly's agency in radio, newspaper, and telephone book advertisements. These advertisements were approved Nationwide format advertisements that listed Donnelly's name, office, and Nationwide's name and slogan.

Nationwide also gave Donnelly awards and public recognition for his sales accomplishments. In fact, he was one of Nationwide's top independent agents with over a million dollars in yearly sales. He won Nationwide's Champion Award in 1988, 1989, and 1990, and also won Nationwide's top sales award, the President's Award, in 1989 and 1990. Nationwide recognized his achievement by publishing his photograph in the New England edition of Time Magazine.

Thus, Donnelly was a successful Nationwide agent for a number of years, during which Nationwide did much to promote him and bestow him with authority. Therefore, the acts and words of the principal consisted of hiring Donnelly, allowing him to advertise his Nationwide agency, subsidizing his advertisements, authorizing him to sell insurance and sell mutual fund products to the public at large, giving him sales materials and prospectuses to facilitate the sale of Nationwide products, and recognizing his exceptional sales achievements.

However, Donnelly was no longer Nationwide's actual agent when he defrauded the plaintiff. Therefore, Mrs. Johnson must demonstrate that he was still an apparent agent at the time he defrauded her, and that she reasonably relied on this authority.

### 1. *Termination*

▮▮▮ Apparent authority may continue after actual authority has been revoked. *Herbert,* 931 F.2d at 996. It lasts until a third party has actual notice of an agent's termination or until the third party has enough information to put that individual on inquiry. *Id.* at 996–97; *Bernstein v. Centaur Ins. Co.,* 644 F.Supp. 1361, 1369 (S.D.N.Y. 1986); *Claflin v. Lenheim,* 66 N.Y. 301, 305 (1876). In the words of the New York Court of Appeals:

> It is a familiar principal of law, that when one has constituted and accredited another his agent to carry on a business, the authority of the agent to bind his principal continues even after an actual revocation, until notice of the revocation is given; and, as to persons who have been accustomed to deal with such agent, until notice of the revocation is brought home to them.

*Claflin,* 66 N.Y. at 305. Furthermore, if the principal does not take "appropriate affirmative steps" to destroy the former agent's apparent authority and "reasonable action" to inform third parties, the principal may be held liable for an apparent agent's actions. *Frank Mastoloni & Sons Inc. v. U.S. Postal Serv.,* 546 F.Supp. 415, 420–21 (S.D.N.Y. 1982); Restatement (Second) of Agency § 125 (1958). Thus, to decide if Donnelly had apparent authority when he committed the fraud, it must be determined whether

Nationwide failed to give reasonable notice of Donnelly's termination, and whether it omitted certain appropriate affirmative steps that were required to destroy the authority that it had given him. An analysis of the circumstances surrounding Donnelly's employment and termination must be made.

That analysis must include the answers to some basic questions:

1. What did Nationwide know, or with reasonable diligence should have known, about Donnelly's fraudulent activity prior to his termination on June 21, 1991?

2. What did Nationwide know, or with reasonable diligence should have known, about Donnelly's propensities to commit future acts of fraud at the time of his termination on June 21, 1991?

3. The same two questions at the time his relationship was formally ended with Nationwide on September 20, 1991.

4. The same two questions at the time the plaintiff was being defrauded by Donnelly in November·and December, 1991.

### 2. *Donnelly's Fraud and Nationwide's Knowledge*

■ The case at bar is an extraordinary one since Donnelly had defrauded Nationwide clients before he was terminated, and posed a risk to the general public since he was likely to commit future criminal acts.

Donnelly engaged in several fraudulent activities while working for Nationwide. In October, November, and December of 1990, Donnelly transferred money from his mother-in-law's and her sister's tax free mutual fund accounts into his own checking account. He was supposed to purchase annuities with these funds, but instead, he kept the investment for himself. This transaction violated NASD laws and regulations, and was spotted and identified by Nationwide supervisors as an improper transaction. Nationwide investigated the transfer and found that several signatures were forged. After a preliminary investigation, investigators recommended that Nationwide trace the funds. However,

Nationwide failed to follow through with the investigation and failed to determine for certain whether Donnelly had defrauded its customers by failing to reinvest the funds. "Nationwide's failure to pursue this investigation shows either an intentional avoidance of the truth or a wanton disregard of it." (Pl.'s Post Trial Br. at 11.) However, even without the required follow up, Nationwide had sufficient information at that time, six months before the official termination, that Donnelly was defrauding its clients. Subsequent events only confirmed this fact.

After this incident, Donnelly began over drafting checks regularly and submitting his clients' payments late. It is a Nationwide policy that an agent must be terminated if he overdrafts two unexplained checks within five years. Donnelly over drafted sixteen checks in a six month period. In response to these "business improprieties" and "remittance deficiencies," [7] Donnelly was placed on a cash only transaction basis. Nationwide made several attempts to correct the problem, but Donnelly thwarted all of them. While investigating and supervising Donnelly, Nationwide realized that he was untrustworthy and that he was likely to commit future improprieties. Describing his impressions of the Donnelly situation on February 5, 1991, over five months before official termination, Tony Ciofani, Nationwide's Accounting Manager, wrote, *"This situation is not only greatly alarming since if Mike [Donnelly] has done this once, he may do this type of thing again, but it also eliminates any credibility with my Division."* (Def.'s Ex. 5) (emphasis added).

Furthermore, after Nationwide decided to terminate Donnelly, but before his license expired, Nationwide received direct proof of his fraud. In April 1991, Desso gave Donnelly a check to purchase a mutual fund, but instead, Donnelly endorsed the check to pay an American Express bill. Desso reported the incident to Nationwide on July 31, 1991, after the decision to terminate Donnelly, but before he was removed from his office and before his license expired. Nationwide con-

---

**7.** Nationwide maintains that it did not know about any of Donnelly's fraud before they terminated him, and that its decision to terminate him was based on the over drafted checks and late payments which it considered only business improprieties and remittance deficiencies.

fronted Donnelly about this transaction, and Donnelly confessed. He agreed to voluntarily repay Desso. However, Donnelly never repaid him, and Nationwide was forced to take the money from Donnelly's deferred compensation accounts. Donnelly also defrauded at least two more customers, Fiondella and Demonte. Nationwide discovered both cases of fraud and forced Donnelly to compensate the clients.

Finally, after Donnelly was terminated and lost his binding authority to sell Nationwide products, he attempted to sell Nationwide insurance. Donnelly sold a homeowner and an auto insurance policy. (Pl.'s Ex. 26). Nationwide's Underwriting Supervisor discovered this attempt and rejected the business. Nationwide then sent Donnelly another letter reminding him that he did not have the binding authority to sell Nationwide products.

Thus, the only conclusion must be that Nationwide knew about Donnelly's fraudulent activities and knew, or should have known, that he was likely to commit future criminal acts. It is in this light that the analysis of the affirmative steps that Nationwide took to remove any vestiges of Donnelly's authority must be viewed.

### 3. *Nationwide's Actions at the Time of Termination and Thereafter*

Nationwide removed Donnelly from his office and confiscated his supplies and his equipment after he was terminated. However, Nationwide was not prompt and allowed Donnelly to keep Nationwide supplies and indicia of authority for several weeks after his termination. Furthermore, when Nationwide removed Donnelly from his office, it did not supervise him while he was packing and did not inventory any of his supplies. In fact, Nationwide failed to collect all of its supplies and indicia of authority. Nationwide kept no record of the visit to Donnelly's office. The Second Circuit has held that "although the principal is entitled to have indicia of authority returned to him upon termination of the relationship, if he is unsuccessful in accomplishing this, the risk of deception to third persons who have otherwise

no notice of the termination rests upon the principal." *Herbert,* 931 F.2d at 994.

Also, Nationwide made no attempts to notify Donnelly's previous customers and the public of his termination. Nationwide failed to send any letters notifying his former clients [8] that he was terminated and was no longer permitted to sell any Nationwide products. Finally, Nationwide did not give public notice in any local newspapers or media. As a result of these omissions, Donnelly's former clients and the general public were uninformed about the status of Donnelly's authority.

Nationwide knew, or should have known, of Donnelly's fraudulent activity while he was employed. It had this knowledge on June 21, 1991, the date he was formally terminated. It had clear and convincing evidence of his fraudulent activity by September 20, 1991, the date he ceased to be an agent, and certainly by November and December of 1991 when the plaintiff was defrauded. Under such circumstances, Nationwide should have taken positive steps to alert the public of the threat Donnelly posed. At a minimum, Nationwide should have initially notified all of Donnelly's clients that he was no longer permitted to sell any Nationwide products. Furthermore, once Nationwide knew for certain that he was defrauding customers, and was disobeying orders not to sell Nationwide products to customers after he was terminated, the company, at the minimum, should have published a notice in the local paper stating that Donnelly was no longer a Nationwide agent.

From the start, Nationwide should have been prompt and forceful in confiscating their indicia of authority from Donnelly. Nationwide should have made a concerted effort to confiscate Donnelly's supplies and any papers with the Nationwide insignia on them as soon as it realized his potential for defrauding their customers. It did not.

Because of these omissions, it must be concluded that Nationwide did not take the necessary reasonable affirmative steps to terminate his agent's authority given the circumstances of Donnelly's actions.

8. Donnelly's former clients included the plaintiff's mother and aunt.

## B. *Reasonable Reliance*

Although Nationwide failed in its obligation to terminate Donnelly's actual authority by omitting several affirmative steps necessary to remove any vestiges of his apparent authority, Nationwide is not responsible for the fraud unless Mrs. Johnson reasonably relied upon Donnelly's apparent authority. The Second Circuit has held that the termination notice requirement is intertwined with and a derivative of the reasonable reliance requirement. *Herbert*, 931 F.2d at 996. In the words of the Second Circuit:

> Apparent authority can exist only as long as the third person, to whom the principal has made a manifestation of authority continues to believe that the agent is authorized. He does not have this reasonable belief if he has reason to know that the principal has revoked, or that the agent has renounced the authority, or that such time has elapsed or such events have happened after the authorization as to require the reasonable inference that the agent's authority was terminated.

*Id.* at 996–97.

To recover under a theory of apparent authority, the plaintiff must also show that she reasonably relied upon the words or actions of the principal. *Herbert*, 931 F.2d at 996–97; *Westchester*, 705 F.Supp. at 169. The reasonableness of this reliance depends upon the characteristics of the third party. *General Overseas Films Ltd.*, 542 F.Supp. at 690.

At the time of the fraud, which was only a few months after Donnelly's termination, Mrs. Johnson was a novice investor. She had never invested before and never had more than a few thousand dollars in a savings account. When she received her personal injury settlement, she was overwhelmed and did not know what do with the money. During the 1991 Thanksgiving holiday, while Donnelly was visiting, he recommended that she invest the money in a Nationwide tax free mutual fund similar to the one that her mother had invested in. Mrs. Johnson inquired whether Donnelly was able to sell Nationwide products, and Donnelly responded that he was no longer permitted to sell Nationwide insurance, but was permitted to sell Nationwide mutual funds. Donnelly explained that although he was no longer an exclusive Nationwide agent, he still sold insurance for other companies and could sell mutual funds for Nationwide. The plaintiff had known Donnelly many years, she knew that he had a long employment history with Nationwide, and that he had won several awards. She claims that she had no reason not to believe him when he explained his relationship with Nationwide. After all, he was a relative and a former priest.

To convince Mrs. Johnson to invest, Donnelly showed her a Nationwide prospectus. Mrs. Johnson also asked her mother, a Donnelly client, whether she was satisfied with her investment and she responded that she thought that it would be a good investment. Mrs. Johnson's mother, Mrs. Kelly, did not know that Donnelly was unable to sell Nationwide tax free mutual funds, because she had received no notice to that effect from Nationwide. After Mrs. Johnson purportedly purchased the fund, Donnelly sent her periodic account statements on Nationwide forms, and even remitted $15,000 on request.

Since Mrs. Johnson was an inexperienced investor, had no notice that Donnelly was unable to sell Nationwide tax free mutual funds, knew that Donnelly had been a very successful Nationwide agent for fifteen years, was shown Nationwide documents promoting the sale, and finally, received support from one of Donnelly's customers who recommended the investment, it was reasonable for Mrs. Johnson to rely on Donnelly's apparent authority.

## C. *Inquiry*

In general, a third party is not required to inquire into the scope of the agent's authority. *Herbert*, 931 F.2d at 995. However, in a few instances, the court may require the third party to make reasonable inquiries about the ostensible agent's actual authority. *Westchester*, 705 F.Supp. at 169. "[I]n the apparent authority context, the duty of inquiry arises only when (1) the facts and circumstances are such as to put the third party on inquiry; (2) the transaction is

extraordinary; or (3) the novelty of the transaction alerts the third party to the danger of fraud." *FDIC v. Providence College,* 115 F.3d 136, 141 (2d Cir.1997); *Herbert,* 931 F.2d at 995–96. The Second Circuit has held that the duty to inquire about the "agent's apparent authority 'amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal.'" *Id.* (quoting *Herbert,* 931 F.2d at 995–96). Therefore, unless the circumstances surrounding Mrs. Johnson's investment were so extraordinary and novel that her reliance on Donnelly's authority would have been unreasonable, there is no duty of inquiry.

The circumstances surrounding this case were not so extraordinary or novel that it was unreasonable for Mrs. Johnson to rely on Donnelly's apparent authority without actually inquiring into his actual authority. The transaction was neither novel nor extraordinary. Nationwide's agents sell Nationwide tax free mutual funds regularly, and receive commissions for the sales. Donnelly had previously sold Nationwide tax free mutual funds, and in fact, he had sold several such funds to Mrs. Johnson's relatives. Finally, although Mrs. Johnson knew that Donnelly was no longer Nationwide's exclusive agent, it was not unreasonable for her to assume that he could still sell its tax free mutual funds. Insurance agents often sell insurance and other investment products for many companies, and therefore, in light of the circumstances and the apparent authority that Donnelly maintained, it was not unreasonable for Mrs. Johnson to believe that Donnelly was simply an independent insurance agent who sold products for many companies. As Mrs. Johnson stated in her testimony, "Mr. Donnelly, was my brother-in-law, I didn't have any reason to question what he said." (Tr. at 222.)

## V.  *CONCLUSIONS*

Under the unique circumstances of this case, Nationwide's omissions and failures to take reasonable actions to destroy Donnelly's

apparent authority results in liability to the plaintiff for his fraudulent act. It is not suggested that Nationwide was required to make guarantees that third parties will not be defrauded by someone like Donnelly. If Nationwide had taken the minimum steps of notification and confiscation as outlined above, and plaintiff had still been defrauded, Nationwide would not be liable.[9] Because, on June 21, 1991, Nationwide failed to take those minimum steps when it knew that Donnelly had committed fraud upon its clients and was susceptible to committing fraud in the future, it is liable. Even after that date, and before the final effective date of termination, when more evidence came forward, Nationwide still failed to take any minimum steps. In fact, despite the mounting evidence with regard to Donnelly's activities, Nationwide never, *at any time, took any steps* to alert its clients or the general public to the fact that Donnelly was no longer authorized to write business for Nationwide. This is in stark contrast to the extensive publicity that was given to him when he was an outstanding agent writing a high volume business. Nationwide made no effort to protect innocent people like Mrs. Johnson from a predator like Michael Donnelly.

It is not suggested that Nationwide was required to place clients and the general public on notice that Donnelly was being terminated because he was suspected of fraud, or that he was suspected of being capable of committing fraudulent acts upon clients in the future. That was not necessary or required. However, at the very least, his records should have been promptly seized, and clear and concise statements issued to all of Donnelly's clients and the general public that he had no authority whatsoever to write any business on behalf of Nationwide. Because of Nationwide's failures and omissions, it will never be known for certain if such steps would have prevented the fraud upon Mrs. Johnson. But, it is not a question of whether or not Nationwide's omissions were a proximate cause of the plaintiff's injury. The question is whether the omissions left Donnelly with sufficient apparent authority,

---

**9.** With proper client and public notification, "the facts and circumstances [would have] put [Mrs. Johnson] on inquiry." *See Westchester,* 705 F.Supp. at 169.

as a Nationwide agent, so that the plaintiff could rely upon that authority without inquiring about its foundation. An answer in the affirmative is required.

The plaintiff is entitled to damages in the sum of Fifty-five Thousand Dollars ($55,-000.00) with interest from December 30, 1991.

Therefore, it is

ORDERED that judgment be entered by the Clerk in favor of the plaintiff Shelly A. Johnson and against the defendants in the sum of Fifty-five Thousand Dollars ($55,-000.00) with interest from December 30, 1991, in the sum of Thirty-four Thousand, Seven Hundred One Dollars and Seventy-six Cents ($34,701.76) [10] for the total of Eighty-nine Thousand Seven Hundred One Dollars and Seventy-six Cents ($89,701.76).

IT IS SO ORDERED.

---

10. This court used the standard interest rate of 9% specified in C.P.L.R. Section 5004.